# Exhibit "C"



CAUSE NO. 09- 1153



FILED

| | | |
|---|---|---|
| CHEM-AQUA, INC., | § | IN THE DISTRICT COURT |
| | § | 2009 AUG 27 PM 3:42 |
| *Plaintiff,* | § | GARY FITZSIMMONS |
| | § | DISTRICT CLERK |
| | § | DALLAS CO., TEXAS |
| | § | _____ DEPUTY |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ACE AMERICAN INSURANCE | § | |
| COMPANY, | § | 162nd |
| *Defendant.* | § | JUDICIAL DISTRICT |
| | § | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE COURT:

Plaintiff, Chem-Aqua, Inc. ("Chem-Aqua"), complains of Defendant, ACE American Insurance Company ("ACE"), and in support of its Original Petition would respectfully show the Court as follows:

### I. Discovery Control Plan

1.    Pursuant to Texas Rule of Civil Procedure 190, discovery in this case should be conducted under Discovery Plan Level 2 (Tex. R. Civ. P. 190.3.)

### II. Parties and Service of Process

2.    Chem-Aqua is a Texas corporation with its principal place of business in Irving, Texas. Chem-Aqua is a wholly owned subsidiary of NCH Corporation ("NCH").

3.    ACE is an insurance company conducting its insurance business in Dallas County, and other parts of Texas. Citation may be served on ACE by serving Robin M.

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 1

Mountain, its registered agent, at 6600 Campus Circle Drive E., Suite 300, Irving, Texas 75063-2732.

### III.  Jurisdiction and Venue

4.      This Court has subject matter jurisdiction because Chem-Aqua is seeking relief in excess of this Court's minimum jurisdictional limits.  This Court has personal jurisdiction over ACE because ACE is doing business in Texas with offices and a registered agent for service of process in Irving, Texas.

5.      Venue is proper in Dallas County, Texas pursuant to §15.002 of the Texas Civil Practice and Remedies Code.

### IV.  Statement of Facts

6.      This is an insurance coverage dispute alleging that ACE has breached its duty to settle an underlying action brought against its insured, Chem-Aqua.  ACE wrongfully and in bad faith asserts that a $2 million deductible rather than a $250,000 deductible applies to Chem-Aqua's insurance claim.  ACE's misconduct has caused Chem-Aqua at least $1.25 million in damages plus attorneys fees and interest.

### (a)  the Subject Insurance Policy and ESIS

7.      ACE issued a Commercial General Liability Policy No. HDO G20579201 in favor of NCH and its affiliates, including Chem-Aqua, for the period May 1, 2003 to May 1, 2004.  A genuine copy of the policy is attached as Exhibit A.  Chem-Aqua is a named insured under the policy as a wholly owned subsidiary of named insured, NCH Corporation. (Policy Endorsement 1.)  The policy insures Chem-Aqua's business liabilities, including "bodily injuries" arising out of its water treatment services during the policy period.  (Policy

Section I – Coverage A, 1. Insuring Agreement.) The general liability insurance limits are $2 million each occurrence. (Policy Declarations, Limits of Insurance at page 2.) The policy has a $250,000 deductible per occurrence for general liability and a $2 million deductible per occurrence for "products-completed operations hazard" coverage. (Policy Endorsement #3.)

8.    ACE negotiated, issued and delivered its policy in the course of its Texas insurance business. ACE issued and delivered the policy to Chem-Aqua's home office in Irving, Texas. Chem-Aqua paid its premium for the policy out of its Texas bank account at the direction of its executives in its Irving, Texas home office. The insurance policy proceeds for this loss are payable to Chem-Aqua in Texas. The insurance producer or insurance broker for the ACE policy is Aon Risk Services Southwest, Inc. in Dallas, Texas.

9.    When ACE issued its policy, ACE required NCH and its affiliates, including Chem-Aqua, to buy claims management services from ACE through a company called ESIS, Inc. ("ESIS"). NCH, for itself and its affiliates, including Chem-Aqua, complied and signed a contract with ESIS for servicing claims involving ACE's policy.

10.    ESIS is part of the ACE group. ACE promotes and advertises ESIS as "the risk management arm of ACE" and as actually "part of ACE." ACE and ESIS promote their relationship in sales, marketing, and advertising materials. Moreover, ESIS correspondence and ESIS claims evaluation reports bear ACE's name, ACE's federally registered trademark, and ACE's logo right next to the ESIS name. Also, ESIS advertises its approach to claims management as "ESIS Impact" and ACE owns the name "ESIS Impact" as a federally registered service mark. Furthermore, ACE's registered agent for service of process in Texas lists the address of ESIS's claims office in Irving, Texas. Genuine copies of selected ACE

and ESIS promotional materials holding ESIS out as part of ACE and ACE's "ESIS Impact" service mark registration, are attached as Exhibit B. Genuine copies of ESIS correspondence and an ESIS claims evaluation report bearing ACE's name, ACE's trademark, and ACE's logo are attached as Exhibit C. ESIS is hereinafter referred to by name or as "ACE's claims management service."

### (b)  the Underlying *Saletta* Suit

11.     On June 25, 2003, the underlying plaintiff (Saletta) suffered chemical burns and blindness while adding bromine to a water treatment system in a building complex in Las Vegas, NV. Saletta was an employee of the building management company (Jones Lang LaSalle). Chem-Aqua's representative (Cheryl Burton) visited the building that day to add chemicals as part of Chem-Aqua's water treatment services agreement with the building owner (Citibank). However, Saletta had done some piping of the system and the glue was not dry. Saletta testified that he told Ms. Burton that his piping work included removal of a check valve in the system. Ms. Burton denied being told of its removal. This was critical because the check valve prevented bacticide from backflowing into the brominator, where the bromine was added. When Ms. Burton asked if she could add chemicals, Saletta told her he would do it for her when the piping glue dried so that she would not have to wait. Saletta also may have offered to add the chemicals because Ms. Burton was pregnant. Ms. Burton left the building complex without finishing her job which was to add chemicals. When Saletta added chemicals later that day, the bacticide backflowed into the brominator and the two chemicals mixed, causing a violent reaction in which the chemicals erupted out of the brominator and splashed onto Saletta's face and upper body.

12.     At the time of Saletta's accident, Chem-Aqua was providing water treatment services for all water flowing through the air conditioning system in the building complex. Chem-Aqua's service agreement with the building owner (Citibank through its agent Jones Lang LaSalle) was ongoing when Saletta's accident occurred. (Citibank Complaint at ¶¶ 10, 23; a genuine copy of Citibank's Complaint is attached as Exhibit D.) Chem-Aqua's service agreement is two documents, a Jones Lang LaSalle form and Chem-Aqua's form contract. Genuine copies are attached as Exhibit E.

13.     Chem-Aqua notified ACE's claims management service (ESIS) of the incident and the possibility of a claim under the ACE policy. In August 2003, ACE acknowledged receipt of notice of Saletta's accident.

14.     On June 10, 2005, Saletta filed a suit for bodily injuries and damages against Chem-Aqua and the building owner. Saletta amended his complaint on November 15, 2005. Saletta alleged that Chem-Aqua negligently performed its water treatment services resulting in his injuries and failed to train and supervise its employees. He also alleged product liability against Chem-Aqua for supplying defective chemicals and equipment. Genuine copies of Saletta's complaint and amended complaint are attached as Exhibit F.

### (c)  Notice of *Saletta* Suit and ACE's Coverage Position

15.     Chem-Aqua promptly sent Saletta's suit papers to ACE's claims management service (ESIS). On July 11, 2006, ACE acknowledged receipt of the suit papers. In response to Chem-Aqua's "request for a coverage determination" under the policy, ACE misrepresented to Chem-Aqua "that the applicable deductible amount of $2,000,000 applies to this claim." (ACE July 11, 2006 letter at 1, 5.) ACE failed to disclose to Chem-Aqua that

Saletta's suit actually triggered ACE's lower $250,000 deductible for allegations of negligent water treatment services provided under a continuing service agreement, and negligent hiring and training of personnel. ACE also purported to reserve its rights to deny all coverage for the *Saletta* suit. A genuine copy of ACE's July 11, 2006 letter is attached as Exhibit G.

16.    On October 2, 2007, ACE's claims management service (ESIS) evaluated Saletta's claim against Chem-Aqua. ESIS determined that ACE's lower $250,000 deductible for general negligence applied instead of ACE's higher $2 million deductible for products liability. ESIS's evaluation and determination that ACE's lower deductible applies is shown in a "Status Report" under the "Coverage" section on the first page of the report. The report bears ACE's name, ACE's federally registered trade mark, and ACE's logo along with the ESIS name in the upper left hand corner of the first page. A genuine copy of the ACE/ESIS Status Report is attached as Exhibit H.

17.    On October 30, 2007, ACE's claims management service (ESIS by Rodger Lewis) advised Chem-Aqua (by Bonnie Reinke) that ACE's lower $250,000 deductible applied instead of the higher $2 million deductible that ACE previously had misrepresented as applicable. ESIS sent Chem-Aqua a copy of the ACE/ESIS Status Report confirming that the lower deductible applied. A genuine copy of ESIS's October 30 e-mail to Chem-Aqua is attached as Exhibit I.

18.    Despite ESIS's October 30, 2007 communication, Ms. Reinke mistakenly believed that ACE's earlier misrepresentation of the deductible still applied. ACE and ESIS did not correct Ms. Reinke because it best served ACE to let her believe incorrectly that the higher $2 million deductible applied to the Saletta claim.

### (d)  Discovery Confirms *Saletta* Triggers ACE's Lower Deductible

19.     Discovery in the *Saletta* litigation, including depositions of Saletta and Chem-Aqua's employee (Cheryl Burton), confirmed that Saletta's claim triggered ACE's lower $250,000 deductible.  Discovery confirmed that Saletta's product liability allegations had no merit.   There was nothing wrong with the chemicals,[1] all government warnings were provided,[2] and Chem-Aqua did not supply any equipment.[3]  Chem-Aqua did not manufacture the chemicals but purchased and resold them as is.[4]  The two chemicals in issue (bromine and bacticide) are federally registered pesticides.  Their product warning labels are set by federal law that bars state law claims.   Chem-Aqua filed a motion for partial summary judgment showing no merit to Saletta's product liability allegations.  A genuine copy of Chem-Aqua's motion collecting the evidence and the law is attached as Exhibit K.

20.     On the other hand, discovery showed that Chem-Aqua was seriously exposed to liability for general negligence related to its continuing water treatment services agreement including allegations that Chem-Aqua: (a) allowed Saletta to add chemicals to the water treatment system when it was Chem-Aqua's job and it claimed to have the expertise for the job;[5] (b) failed to hire, train, and provide a qualified employee to perform the water treatment

---

[1] Saletta, 219:11-19, 220:18-25.  Genuine copies of deposition selections cited herein are attached as Exhibit J.

[2] Saletta, 104:17-25, 105:1-15, 107:1-6, 109:3-9, 204:6-10, 20-22, 219:5-10.

[3] Adamson, 124:13-17; Burton, 96:13-25; Saletta, 79:11-15, 103:23-25, 104:1, 216:1-14.

[4] Simmons, 27:17-25, 28:1-4.

[5] Adamson, Ex. A at Ex. 7 at Building Services Agreement, Ex. A, II.B & IV.C; Burton, 55:4-6, 60:16-25, 61:19-25, 62:1-2, 65:5-18; Saletta, 144:2-18, 145:15-25, 146:1-10, 148:5-11.

services;[6] and (c) failed to warn Saletta that the configuration of the piping was dangerous, that Saletta should not have removed the check valve (which prevented the bacticide from backflowing into the bromine), and that Saletta should not have started up the system without the check valve.[7]

### (e) Mock Jury Results

21.    Chem-Aqua hired a focus group service that convened two mock juries to hear the evidence and render verdicts.  The two juries consisted of a total of twenty-three people randomly selected.  On August 14, 2008, the two mock juries returned large verdicts in favor of Saletta and against Chem-Aqua.  Both juries rejected products liability as a basis for recovery.  Instead, the juries found Chem-Aqua liable for allowing Saletta to add chemicals when it was Chem-Aqua's job, failing to warn Saletta that his piping and valve changes were dangerous, and failing to hire and properly train a qualified person for water treatment. Chem-Aqua subsequently provided ACE with a detailed written description and analysis of the two mock juries' deliberations, findings, and verdicts.

### (f) ACE Seizes Control of Chem-Aqua's Defense

22.    On or about December 31, 2008, Chem-Aqua contacted ACE's claims management service (ESIS).  Chem-Aqua reported that its employee (Bonnie Reinke) had left the company, and that the employee taking over the file (Russ Price) had discovered that

---

[6] Adamson, Ex. A at Ex. 7 at Building Services Agreement, Ex.A, I.A; Burton, 7:21-22, 34:3-6, 35:1-6, 62:23-25, 63:5-7, 66:21-23, 69:11-16, 108:13-16; Saletta, 111:12-25, 129:8-11, 205:12-17; Simmons, 41:5-7, 13, 44:20-25, 62:15-23, 63:1-8, 70:8-18.

[7] Burton, 55:13-20, 56:22-25, 57:1-5, 73:4-6, 98:19-21, 57:13-21, 62:17-20, 108:25, 109:1-5, 102:14-20; Saletta, 63:3-5, 11-13, 110:6-8, 116:19-25, 117:1-5, 118:5-6, 18-25, 119:1-4, 19-25, 120:1-5, 127:6-25, 149:8-11, 204:23-25, 205:1, 218:21-24, 222:7-10.

ESIS's October 2007 assessment was correct, and that the lower $250,000 deductible applied to Saletta's claim. Chem-Aqua also advised that it wanted to settle *Saletta* for $1.5 million and requested ACE's consent.

23.    On the same day, ESIS confirmed that the lower deductible applied in a letter to Chem-Aqua. ESIS's letter states "OPBI $250,000" to indicate that Saletta's claim is for ongoing operations/bodily injury, triggering ACE's lower $250,000 deductible. A genuine copy of ESIS's letter of December 31, 2008 is attached as Exhibit L.

24.    On January 9, 2009, ACE (by Alison Walz) seized control of Chem-Aqua's defense of the *Saletta* suit by taking over Chem-Aqua's ongoing settlement negotiations with Saletta. ACE threatened Chem-Aqua with loss of its coverage if Chem-Aqua did not immediately comply. ACE commanded Chem-Aqua "not to engage in any further negotiations" with Saletta. ACE also demanded that Chem-Aqua "notify plaintiffs that no further negotiations will take place and that all offers are off the table for the time being." ACE threatened Chem-Aqua that any offers made to Saletta "in excess of the [lower $250,000] deductible will be considered a voluntary payment" thereby forfeiting Chem-Aqua's insurance coverage. ACE impermissibly seized control when it had a conflict of interests. ACE's conflict was its motivation to support Saletta's product liability allegations so that ACE's higher $2 million deductible would apply and ACE would pay nothing. ACE may have had other conflicts, too. A genuine copy of ACE's January 9, 2009 e-mail seizing control is attached as Exhibit M.

25.    Chem-Aqua responded within minutes to ACE's threat of forfeiting coverage and bowed to ACE's demands. Chem-Aqua immediately instructed its defense counsel to

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 9

withdraw all settlement offers to Saletta and all offers were withdrawn by defense counsel that same day. In response to ACE questioning, Chem-Aqua advised that it was "agreeing with the original assessment by ESIS that the $250,000 deductible applies" based "on the policy and the pleadings and the facts alleged therein and during discovery." Chem-Aqua also asked ACE for its decision on settlement of *Saletta* before a crucial hearing on motions for summary judgment scheduled for January 21, 2009. Genuine copies of Chem-Aqua's (by Russ Price) January 9, 2009 e-mail response to ACE (by Alison Walz) and ACE's claims management service (ESIS by Rodger Lewis), and defense counsel's January 9, 2009 facsimile letter withdrawing all settlement offers to Saletta are attached as Exhibit N.

26.     On January 13, 2009, Chem-Aqua delivered to ACE and its claims management service (ESIS) a set of case materials confirming the lower deductible applied, including pleadings, a court papers index of filings, nine deposition transcripts, and other answers to discovery. Chem-Aqua invited requests for any additional materials. Genuine copies of Chem-Aqua's (by Le Ann Bishop) January 13, 2009 e-mail deliveries are attached as Exhibit O.

### (g)  ACE Continues to Obstruct Settlement with Saletta

27.     On January 22, 2009, ACE through attorneys refused consent to settlement on any basis. ACE ignored the case materials Chem-Aqua had sent, showing $1.5 million was reasonable and that the lower $250,000 deductible applied. ACE threatened Chem-Aqua that "ACE will deem any settlement to be a voluntary payment made without ACE's consent" thereby forfeiting coverage. A genuine copy of ACE counsel's January 22, 2009 letter is attached as Exhibit P.

### (h)  Saletta's Time Limited Settlement Demand

28.    On January 27, 2009, Saletta served a time limited settlement demand for a global settlement, allocating $1.5 million to Chem-Aqua.  Saletta set his demand to expire on February 6, 2009 because of impending expert depositions and a trial set for April 21, 2009. ACE received a copy that day from Chem-Aqua's underlying defense counsel.  A genuine copy of Saletta's demand letter is attached as Exhibit Q.

### (i)  Defense Counsel Case Analysis and Settlement Recommendation

29.    On February 3, 2009, ACE said it looked at the *Saletta* case materials but the $2 million deductible should apply.  On February 4, 2009, ACE received Chem-Aqua's underlying defense counsel's (Jones Vargas) written case analysis and recommendation to accept Saletta's offer to settle with Chem-Aqua for $1.5 million.  Underlying defense counsel's analysis showed that $1.5 million was reasonable because Saletta had a 95% chance of a jury verdict against Chem-Aqua for at least $2.16 million up to $4.2 million. Defense counsel confirmed the absence of merit to Saletta's product liability allegations. However, defense counsel was emphatic that the evidence against Chem-Aqua could support a verdict for negligent servicing, and negligent hiring, and training of Ms. Burton.

30.    Chem-Aqua's defense counsel's written case analysis also described and analyzed the deliberations, findings, and verdicts of the two mock juries.  Defense counsel particularly noted as follows:

> "Both groups found that Chem-Aqua acted negligently.  They focused on Cheryl Burton's lack of qualifications for the job, and that she should have handled the chemicals.  Time and again the participants noted that the expert in the chemical business was Chem-Aqua, and the

company should have ensured that Saletta was adequately trained and that he was not handling the chemicals. The participants also laid a considerable amount of blame on Cheryl Burton for failing to recommend replacement of the check valve, or at a minimum, noticing that it was gone. [Also, one of the juries found] ... that Chem-Aqua was not meeting its contractual duties in training Saletta, handling chemicals, and not having a representative from Chem-Aqua with an engineering degree."

(February 4, 2009 Jones Vargas letter.)

### (j) ACE Ignores the Evidence and Refuses to Fund any Settlement

31.    Also on February 4, 2009, Chem-Aqua informed ACE through coverage counsel that Chem-Aqua agreed with its defense counsel's case analysis and recommendation to accept Saletta's $1.5 million settlement demand before it expired on February 6, 2009. Chem-Aqua requested ACE's consent to settle and ACE's funding of the settlement excess of its $250,000 deductible for Saletta's claim. A genuine copy of Chem-Aqua coverage counsel's February 4, 2009 e-mail correspondence is attached as Exhibit R.

32.    On February 5, 2009, ACE asserted that its higher $2 million deductible applied to *Saletta* and refused to fund the proposed $1.5 million settlement alleging it was within the deductible. ACE's actions ignored the evidence. ACE went on to say it would "waive the policy provision which provides that '[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent' so that NCH/Chem-Aqua may enter into a $1,500,000 settlement of the *Saletta* matter if it elects to do so." (ACE February 5, 2009 letter at 1; a genuine copy is attached as Exhibit S.) However, ACE also purported to "reserve all of its rights ... to raise coverage issues ... all of its rights to maintain that the applicable deductible

is $2,000,000, and all of its rights to challenge the reasonableness of the settlement...." (*Id.*) ACE's reservation of rights continued to hold Chem-Aqua hostage. ACE's reservation forced Chem-Aqua to choose between a potential verdict of at least three times Saletta's offer, and ACE's threat of a policy breach for settling. Plainly, if ACE believed that its $2 million deductible applied then it had no financial stake in the matter and should have simply denied funding.

33.    Chem-Aqua by its insurance counsel immediately challenged ACE's wrongful refusal to fund the settlement in light of the evidence and the law as follows:

> "[T]he *Saletta* claim arises from its [Chem-Aqua's] non-products negligence and operations under a continuing service contract. Accordingly, the loss is outside the 'products-completed operations hazard.' Instead, the loss is within ACE's general liability coverage with its lower $250,000 deductible. 'An injury that results from operations performed under a *continuing* service contract ... may not be covered under the completed operations provision because of the continuing nature of the relationship.' Ostrager & Newman, *Handbook On Insurance Coverage Disputes* (11[th] ed., sec. 7.02[b] at 336) (emphasis in original).
>
> "ACE is obstructing settlement of the *Saletta* claim by refusing to fund the settlement excess of NCH's [Chem-Aqua's] $250,000 deductible. ACE is wrongfully forcing NCH [Chem-Aqua] to fund an amount that ACE should be paying."

Chem-Aqua insurance counsel's February 5, 2009 response to ACE is attached as Exhibit T.

### (k) Excess Insurer Demands that ACE Settle *Saletta*

34.    On February 6, 2009, Chem-Aqua's excess insurer (National Union overlying ACE's primary policy) assessed the case and demanded that ACE immediately settle Chem-Aqua's liability for the $1.5 million that Saletta was demanding and defense counsel was recommending. The excess insurer warned ACE that:

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 13

"We have been advised that Plaintiff, Anthony Saletta, recently demanded $1,500,000 to settle this case as to the insured.... We understand that there is some dispute between ACE and the insured regarding the applicable deductible. Regardless of that dispute, it is an ACE policy that provides coverage up to $2M. We hereby demand that you protect the insured and settle this case immediately. Should your failure to settle this case result in a verdict which exposes our layer of coverage, we will consider your failure to settle to be in bad faith. Accordingly, we will seek to hold ACE responsible for any exposure to the umbrella policy."

A genuine copy of the excess insurer's demand on ACE to settle is attached as Exhibit U.

### (l)  ACE Wrongfully Forces Chem-Aqua to Pay Entire Settlement

35.     On February 6, 2009, ACE again refused to pay any part of Chem-Aqua's proposed settlement. Chem-Aqua was constrained to accept Saletta's $1.5 million settlement offer before it expired at day's end. Chem-Aqua was constrained to accept this settlement rather than risk a potential verdict for at least three times the amount. The other parties settled, too. All parties settled for a total of $1.9 million including Chem-Aqua's $1.5 million and the building owner's (Citibank) $400,000. The parties' global settlement is reflected in their Settlement Agreement And Mutual Release and related papers. Genuine copies are attached as Exhibit V.

### (m)  The Parties' Settlement Papers Contain Important Findings

36.     The parties' settlement papers contain important findings that reflect facts learned in discovery and the reasons for Chem-Aqua's payment. The settlement agreement provides, in pertinent part, that Chem-Aqua is paying $1.5 million as "damages" for "bodily injuries" Saletta suffered in his accident on June 25, 2003 and further states as follows:

"Chem-Aqua shall pay Saletta damages for his bodily injuries in the amount of ... $1,500,000 ... ("Chem-Aqua Settlement Sum"). Chem-Aqua shall pay the Chem-Aqua Settlement Sum in resolution of Saletta's claim against Chem-Aqua for ordinary negligence under a

continuing services contract for water treatment as more particularly alleged as follows: 1) Chem-Aqua's alleged failure to instruct Saletta not to add chemicals to the water treatment system or supervise him while adding chemicals; 2) Chem-Aqua's alleged failure to warn Saletta of the dangers of operating the water treatment system without the check valve or the configuration of the water treatment system, and

3) Chem-Aqua's alleged failure to properly hire and train employees as provided in the underlying contract. Chem-Aqua shall pay the Chem-Aqua Settlement Sum to Saletta pursuant to a Consent Judgment and Order when it is approved and entered by the court. Saletta shall take nothing from Chem-Aqua on his product liability and other claims."

Settlement Agreement And Mutual Release at page 2.

37.    The settlement agreement calls for entry of a Consent Judgment and Order ("Consent Judgment") against Chem-Aqua to facilitate the settlement. The Consent Judgment as entered states that it has been reviewed by the court and that the court finds that it "has been entered in good faith" and that it is in "all respects just, reasonable, [and] equitable." (Consent Judgment at page 2 of 3.) The Consent Judgment also provides that "Chem-Aqua shall pay $1.5 million as damages for Saletta's bodily injuries in resolution of Saletta's claim against Chem-Aqua for ordinary negligence under a continuing services contract for water treatment. Saletta shall take nothing from Chem-Aqua on his product liability and other claims." (Consent Judgment at ¶ 1, page 2 of 3.) The court also entered an order finding that Chem-Aqua's settlement was made in "good faith." (Order Granting Defendant Chem-Aqua, Inc.'s Motion For Good Faith Settlement On Order Shortening Time at page 2 of 2.)

38.    Chem-Aqua has performed all conditions that may be due for its part under ACE's policy including payment of all policy premiums.

### V.  First Cause of Action (Breach of Insurance Contract)

39.    Plaintiff repeats and realleges ¶¶ 1-38 as and for ¶ 39 of its First Cause of Action (Breach of Insurance Contract).

40.    The *Saletta* suit and Chem-Aqua's settlement are within ACE's coverage and trigger ACE's lower $250,000 deductible for general liability.  Accordingly, ACE has a duty to indemnify Chem-Aqua for the *Saletta* settlement in the amount of at least $1.25 million plus attorney fees and interest based on the foregoing facts and the following policy wording.

### (n)  the Claim is within ACE's Bodily Injury Coverage

41.    ACE insures Chem-Aqua for "bodily injury" liability as follows.

SECTION I - COVERAGES
COVERAGE A.  BODILY INJURY ... LIABILITY

¶ 1.    Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" ... to which this insurance applies....

b.  This insurance applies to "bodily injury" ... only if:

(1)  The "bodily injury" ... is caused by an "occurrence" that takes place in the "coverage territory";

(2)  The "bodily injury" ... occurs during the policy period ....

(Section I. Coverage B., policy page 1 of 16.)

SECTION V – DEFINITIONS

¶ 3.    "Bodily injury" means bodily injury....

¶ 4.    "Coverage territory" means:

a.  The United States of America....

¶ 13.   "Occurrence" means an accident....

(Section V. Definitions, policy pages 13 & 14 of 16.)

42.     Saletta suffered injuries to his body caused by an accidental eruption of chemicals allegedly resulting from Chem-Aqua's general negligence.   Saletta's accident occurred on June 10, 2005 in Las Vegas, NV which is within the policy period (May 1, 2003- May 1, 2004) and the coverage territory (US).  The *Saletta* settlement and judgment legally obligated Chem-Aqua to pay, and it has paid, damages because of Saletta's bodily injuries. Accordingly, Chem-Aqua's insurance claim is within ACE's coverage.   Chem-Aqua's liability and $1.5 million payment for the *Saletta* settlement is within ACE's each occurrence limit of $2 million.

### (o)  ACE's Deductible Endorsement

43.     ACE by Endorsement #3 assigns a $250,000 deductible per occurrence for all bodily injury except "injury or damage included in the 'products-completed operations hazard'" which bears a $2 million deductible.  Endorsement #3, in pertinent part, states as follows.

> ¶ 1.   Our obligation to pay damages under this Policy applies only to sums for which an insured becomes legally obligated to pay as damages in excess of the Deductible-Per Occurrence shown below:
>
> > ¶ A.   Deductible Per Occurrence of $2,000,000 in damages because of injury or damage included in the "products – completed operations hazard" and any related contractual liability arising out of any one "occurrence."
> >
> > ¶ B.   ....
> >
> > ¶ C.   Deductible Per Occurrence of $250,000 in damages because of all other "bodily injury" or "property

damage" to which this insurance applies arising out of any one "occurrence."

(Policy Endorsement # 3 at 1.)

44.    ACE's policy defines its coverage for "Products-completed operations hazard" as follows.

¶16.    "Products-completed operations hazard":

a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)    Products that are still in your physical possession; or

(2)    Work that has not yet been completed or abandoned.    However, "your work" will be deemed completed at the earliest of the following times:

(a)    When all of the work called for in your contract has been completed.

(b)    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

¶ 21.   "Your product":

    a.    Means:

        (1)    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by ... You....

¶ 22.   "Your work":

    a.    Means:

        (1)    Work or operations performed by you or on your behalf; and

        (2)    Materials, parts or equipment furnished in connection with such work or operations.

(Section V. Definitions, policy pages 15 & 16 of 16.)

### (p)  the Evidence and Law Show ACE's Lower Deductible Applies

45.     The evidence (including, the discovery in *Saletta*, the mock juries, the claim evaluations of ESIS, defense counsel, and the excess insurer, and Chem-Aqua's settlement papers) and the law, show that ACE's $2 million deductible for "products-completed operations hazard" coverage does not apply.  (Petition at ¶¶ 11-12, 16-17, 19-21, 23, 29-30, 34, 36-37.)  There was no merit to Saletta's allegations of product liability.  (Petition at ¶¶ 19-21, 29-30, 36-37.)  The evidence shows there was nothing wrong with the chemicals, all government warnings were provided, and Chem-Aqua did not supply any equipment. (Petition at ¶¶ 19, 29.)  Chem-Aqua did not manufacture the chemicals but purchased and resold them as is.  (*Id.*)  The two chemicals in issue (bromine and bacticide) are federally registered pesticides.  Their product warning labels are set by federal law that bars state law claims.  (*Id.*)

46.    *Saletta* does not fall within ACE's "completed operations hazard" either. Chem-Aqua's alleged misconduct occurred while performing water treatment services under a continuing contract. Chem-Aqua's services contract was ongoing. (Petition at ¶¶ 11-12.) Moreover, Chem-Aquas's representative (Burton) had not even finished her job of adding chemicals on the day Saletta was hurt. (Petition at ¶ 11.) ACE's policy says its "completed operations hazard" does not apply to Chem-Aqua "work that has not yet been completed" and shall not apply until "all of the work called for in your contract has been completed." (Policy Definitions, 16. "Products-completed operations hazard" at 2(a).) The law is equally clear that ACE's "completed operations hazard" does not apply. *Houston Building Service Inc. v. American General Fire*, 799 S.W.2d 308, 311(Tex.Civ.App.-Houston 1990) (Work not a "completed operation" because janitorial services contract was ongoing, even though damaging linseed oil application was complete.).

47.    Chem-Aqua's insurance claim triggers ACE's lower $250,000 deductible. The evidence in *Saletta* and Chem-Aqua's settlement papers show that Saletta's injuries resulted from Chem-Aqua's ongoing water treatment services under a continuing agreement. More specifically, the allegations creating exposure were that Chem-Aqua: (a) allowed Saletta to add chemicals to the water treatment system when it was Chem-Aqua's job and it claimed to have the expertise for the job; (b) failed to hire, train, and provide a qualified employee to perform the water treatment services; and (c) failed to warn Saletta that the configuration of the piping was dangerous, that Saletta should not have removed the check valve (which prevented the bacticide from backflowing into the bromine), and that Saletta

should not have started up the system without the check valve. (Petition at ¶¶ 11-12, 20-21, 29-30, 36-37.)

### (q) ACE has the Burden to Prove its Higher Deductible

48.     ACE has the burden to prove that its higher $2 million deductible applies. Endorsement #3 applies a $250,000 deductible per occurrence to all bodily injury except "injury or damage included in the 'products-completed operations hazard.'" (Policy Endorsement #3 at 1.) ACE must prove its exception to its generally applicable $250,000 deductible. ACE must prove its exception, particularly because its higher $2 million deductible forfeits all coverage for Chem-Aqua's $1.5 million settlement with *Saletta*. *Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999) ("If there are any contractual provisions that could limit or bar recovery, it is incumbent on the insurer to plead and prove them."); Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 14.08 (3d ed. 2009 supp.) ("Even if a coverage-limiting provision in a policy is not denominated as an 'exclusion,' if an insurer is relying on language in a definition, condition, or other portion of a policy to defeat or reduce coverage, the provision is treated as an exclusion, it is narrowly construed against the insurer in favor of coverage, and the insurer must successfully shoulder the burden of persuasion on the issue.").

### (r) the Evidence Shows the Settlement is Reasonable

49.     The evidence shows that Chem-Aqua's settlement of *Saletta* for $1.5 million is reasonable. Chem-Aqua accepted Saletta's time limited offer rather than risk a potential verdict for at least three times the amount at trial. (Petition at ¶ 29.) Chem-Aqua took the advice of its defense counsel to settle for $1.5 million. (Petition at ¶¶ 29-30.) Chem-Aqua

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 21

heeded the results of the mock juries. (Petition at ¶¶ 21, 30.) Chem-Aqua also followed its excess insurer's advice and demand to settle. (Petition at ¶ 34.) Also, Chem-Aqua's settlement papers, including the Consent Judgment, show that Chem-Aqua's settlement was the only responsible course of action in the circumstances. (Petition at ¶¶ 36-37.) Finally, Chem-Aqua was relieved of any duty to obtain ACE's consent to settle because ACE essentially denied coverage. ACE's refusal to fund any settlement on any terms amounted to a denial. (Petition at ¶¶ 27, 32, 34.) Also, ACE's assertion of its larger $2 million deductible that exceeded Saletta's $1.5 million settlement offer, amounted to a denial by leaving Chem-Aqua with no coverage. (*Id.*)

## VI. Second Cause of Action (Treble Damages Under § 541)

50.     Plaintiff repeats and realleges ¶¶ 1- 49 as and for ¶ 50 of its Second Cause of Action (Treble Damages Under § 541).

51.     ACE is guilty of unfair settlement practices under Texas Insurance Code § 541 at least in the following respects. ACE's refusal to pay anything for Chem-Aqua's settlement of *Saletta* when ACE knew or should have known that it was reasonably clear that the claim was covered by the policy and that the lower $250,000 deductible applied, is a violation of § 541.060(a)(2)(A). Also, ACE's refusal to pay anything for Chem-Aqua's settlement without conducting a reasonable investigation of the claim and ignoring the evidence learned in discovery in *Saletta* is a violation of § 541.060(a)(7). ACE "knowingly" committed the unfair settlement practices alleged. Section 541.002(1) defines "knowingly" as "actual awareness of the unfairness of the acts" and also provides that "actual awareness may be inferred if objective manifestations indicate that a person acted with actual

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 22

awareness." ACE's knowing violations entitle Chem-Aqua to three times the $1.25 million that ACE should have paid or $3.75 million plus attorney fees, interest, and any other relief the Court deems proper under § 541.152.

52.     As early as October 2007, ACE knew that its own "risk management arm," which is "part of ACE" (ESIS), had evaluated *Saletta* and found that ACE's lower $250,000 deductible applied. (Petition at ¶¶ 10, 16-17.) However, ACE misrepresented to Chem-Aqua (Bonnie Reinke) that its higher $2 million deductible controlled. (Petition at ¶ 15.) Chem-Aqua (Reinke) mistakenly relied on ACE's misrepresentation for over two years. (Petition at ¶¶ 18, 22.) When Chem-Aqua discovered the truth about the deductible and contacted ESIS in December 2008, ESIS reaffirmed that ACE's lower $250,000 deductible applied. (Petition at ¶¶ 22-23.) On January 9, 2009, ACE took over Chem-Aqua's defense and control of *Saletta* by commanding Chem-Aqua "not to engage in any further negotiations" with Saletta. (Petition at ¶ 24.) ACE directed Chem-Aqua to "notify plaintiffs that no further negotiations will take place and that all offers are off the table for the time being." (*Id.*) ACE took over, threatening Chem-Aqua that any offers made to Saletta "in excess of the deductible will be considered a voluntary payment." (*Id.*)

53.     When ACE seized control, it conceded its $250,000 deductible applied for at least two reasons. First, ACE's action conceded the point by its policy wording. Endorsement #3 permits ACE to take control if the claim or suit seeks "damages covered under this Policy that We [ACE] believe will exceed the Deductible." (Policy Endorsement #3 at 4. (d).) ACE's action conceded its lower deductible applied because ACE had no stake in the matter if its $2 million deductible applied. Second, ACE conceded the point by

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 23

threatening Chem-Aqua that any offer Chem-Aqua made "in excess of the deductible will be considered a voluntary payment." (Petition at ¶ 24.)  ACE's threat conceded its $250,000 deductible applied because ACE, again, had no stake if its $2 million deductible applied.

54.    Also, ACE is estopped to dispute that its $250,000 deductible applies.  ACE is estopped because it had a conflict of interests when it took over Chem-Aqua's settlement negotiations without obtaining Chem-Aqua's informed consent.  ACE's conflict was its motivation to support Saletta's product liability allegations so that its higher $2 million deductible would apply.  ACE failed to inform Chem-Aqua of the conflict.  ACE failed to obtain Chem-Aqua's informed consent while asserting control over Chem-Aqua's settlement negotiations.

55.    On January 22, 2009, ACE refused to consent to settle *Saletta* on any basis. ACE's refusal ignored the discovery in *Saletta* that Chem-Aqua had sent. (Petition at ¶¶ 26-27.)  ACE, again, threatened Chem-Aqua that "ACE will deem any settlement to be a voluntary payment made without ACE's consent." (Petition at ¶ 27.)  ACE's threat, again, conceded that its $250,000 deductible applied because ACE had no stake in the matter if its $2 million deductible applied.

56.    On February 4, 2009, ACE received Chem-Aqua defense counsel's case analysis and recommendation to settle *Saletta* for $1.5 million before Saletta's offer expired. Defense counsel's analysis included the evidence learned in discovery and the mock jury evidence showing there was no merit to Saletta's product liability allegations but that Chem-Aqua could likely be liable for negligent servicing, hiring and training.  (Petition at ¶¶ 29-

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 24

30.)  ACE also received Chem-Aqua's plea that ACE consent to the settlement and fund $1.25 million of it excess of Chem-Aqua's $250,000 deductible.  (Petition at ¶ 31.)

57.    On February 5, 2009, ACE acknowledged receipt of defense counsel's case analysis and settlement recommendation, and Chem-Aqua's plea.  ACE asserted that its higher $2 million deductible applied to *Saletta* and refused to fund the proposed $1.5 million settlement alleging it was within the deductible.  (Petition at ¶32.)  ACE went on to say it would "waive the policy provision which provides that '[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent' so that NCH/Chem-Aqua may enter into a $1,500,000 settlement of the *Saletta* matter if it elects to do so." (*Id.*)

58.    However, ACE also purported to "reserve all of its rights ... to raise coverage issues ... all of its rights to maintain that the applicable deductible is $2,000,000, and all of its rights to challenge the reasonableness of the settlement...." (*Id.*)  ACE's purported reservation of rights continued to hold Chem-Aqua hostage.  ACE's reservation unfairly forced Chem-Aqua to choose between a potential verdict of at least three times Saletta's offer, and ACE's threat of a policy breach for settling.  (*Id.*)  ACE's "reservation of rights" to challenge its coverage for the $1.5 million settlement, conceded that its $250,000 deductible applied because ACE had no stake in the matter if its $2 million deductible applied.  (*Id.*)  ACE's "reservation of rights" to refuse coverage for the $1.5 million settlement while asserting that its $2 million deductible applied, amounted to badgering and intimidation of Chem-Aqua.

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 25

59.     ACE also ignored the excess insurer's February 6, 2009 assessment and demand that ACE agree to settle *Saletta* and fund $1.25 million of the settlement. (Petition at ¶ 34.)   ACE subsequently and wrongfully forced Chem-Aqua to fund the entire $1.5 million settlement including the $1.25 million portion that ACE should have paid. (Petition at ¶ 35.)

## VII.  Jury Demand

60.     Chem-Aqua hereby demands a trial by jury.

## VIII.  Request for Disclosure

61.     Pursuant to the Texas Rules of Civil Procedure, Defendant, ACE is requested to disclose, within 50 days of the service of this Original Petition, the information or material described in Rule 194.2(a-1).

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Chem-Aqua, Inc. respectfully requests that Defendant, ACE American Insurance Company be cited to appear and answer within the time required by law, and that on a final hearing, Plaintiff recover a judgment from the Defendant as follows:

1.     Actual damages for the amount stated above;

2.     Treble damages;

3.     Prejudgment and post judgment interest at the maximum permissible rates;

4.     Reasonable and necessary attorney's fees;

5.     Court costs;

6.     Such other and further relief to which Plaintiff may be justly entitled.

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 26

Respectfully submitted,

PALMER & ASSOCIATES

By: _____
      Dwight B. Palmer, Jr.*
      IL State Bar No. 2137372
      Ericka C. Hammett*
      IL State Bar No. 6294299

200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
(312) 347-0843
(312) 347-0844 (fax)

* Not admitted to practice law in Texas.  A
motion to appear pro hac vice will be made
as soon as possible.

**ATTORNEYS FOR THE PLAINTIFF**

BROWN MCCARROLL, L.L.P.

By: _____
      Richard A. Illmer
      TX State Bar No. 10388350
      Chad A. Johnson
      TX State Bar No. 24026259

2001 Ross Avenue, Suite 2000
Dallas, Texas 75201-2997
(214) 999-6100
(214) 999-6170 (fax)

PLAINTIFF'S ORIGINAL PETITION
CHEM-AQUA, INC. V. ACE AMERICAN INSURANCE CO.

PAGE 27